**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LARRY VERNON SNOW &<br>BRYANT AUSTIN SNOW,<br><br>                                           *Defendants.* | CASE NO. 3:19-cr-18<br><br><br>MEMORANDUM OPINION<br>& ORDER<br><br><br>JUDGE NORMAN K. MOON |

This matter is before the Court on Defendants' joint motion to exclude certain recorded jailhouse calls. Dkts. 133, 139. For the reasons stated herein, the motion will be granted in part and denied in part.

I

In October of 2019 Larry Vernon Snow and his son, Bryant Austin Snow, were indicted for three federal felony offenses. Dkt. 3. Count One of the superseding indictment charges Bryant with distribution of heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Dkt. 58 ¶¶ 25–27. Count Two charges both Larry and Bryant with conspiracy to: (1) unlawfully transfer, possess, or use the means of identification of another person in connection with unlawful activity in violation of 18 U.S.C. § 1028(a)(7); (2) retaliate against a government informant in violation of 18 U.S.C. § 1513(e); and (3) harass a witness in violation of 18 U.S.C. § 1512(d)(1), (2), and (4). *Id*. at ¶ 28.

In support of these charges the Government alleges the following. In October and November of 2017, the Greene County Sheriff's office conducted controlled purchases of heroin

and methamphetamine from Bryant. *Id*. at ¶¶ 5–6. Both purchases were made using a confidential informant, an individual referred to as "Person A" throughout these proceedings. *Id*.

Bryant was charged in state court with two distribution of a controlled substance violations. *Id*. at ¶ 8. During discovery, Bryant received a report from the Commonwealth's Attorney containing license plate numbers of vehicles driven by Person A during the controlled purchases. *Id*. at ¶ 9. To protect his identity, Person A was not mentioned by name in those documents. *Id*.

Bryant ultimately chose to plead guilty to the methamphetamine distribution charge in exchange for dismissal of the heroin charge. *Id*. at ¶ 10. As a term of his plea agreement, Bryant was not to commit any new criminal offenses and not to have any contact with various named individuals, including Person A. *Id*.

Bryant was sentenced on April 20, 2018. *Id*. at ¶ 11. The following day, during a recorded jailhouse call, Bryant and Larry commiserated about the unexpectedly long sentence Bryant had received and discussed retaliating against Person A by outing him as a snitch. *Id*. at ¶ 12. Bryant told his father about the documents containing Person A's license plate numbers and asked him to look up the associated registration information so that he could "match those two cars to [Person A]'s mama's name and his name." *Id*. at ¶ 14. Larry agreed. *Id*.

On April 27, 2018, during a recorded conversation with Bryant, Larry used his access as Greene County's Commissioner of Revenue to conduct DMV searches of the license plate numbers provided by Bryant, *id*. at ¶ 16; a use of the database that violated the terms of the DMV user agreement Larry had previously signed, *id*. at ¶ 17. After confirming that the plates belonged to Person A and Person A's mother, Bryant told Larry to "print about five copies of each" DMV printout and "send me one of each please." *Id*. Larry responded, "I'll do it." *Id*.

2

That same day Larry mailed the DMV printouts to Bryant. *Id*. at ¶ 17. The printouts included, among other things, Person A's and Person A's mother's names, addresses, vehicle identification numbers, vehicle title numbers, and license plate numbers. *Id*. Meanwhile, Bryant asked his girlfriend to post the discovery documents alongside the DMV printouts on Facebook to "prove [Persona A]'s the rat who snitched[.]" *Id* at ¶ 18. And the next day Bryant asked Larry to give copies of the DMV information to his girlfriend so that "she could put it on Facebook [and] let everybody know[.]" *Id*. at ¶ 19. Bryant would also later report to his mother that he "got Dad to pull the DMV records", "got the person's name", and would send it to his girlfriend "so she can put it on my Facebook and her Facebook." *Id*. at ¶ 20.

On April 30, 2018, Bryant reported to his father—in another recorded jailhouse call—that he had received the documents and had already showed them to fellow inmates, who also wanted to post the information on their own Facebook pages. *Id*. at ¶ 21. Larry and Bryant agreed that they should "let everybody do it"—it would "come back and bite [Person A] in the ass." *Id*.

Law enforcement recovered the DMV printouts in Bryant's jail cell while executing a search warrant on May 2, 2018. *Id*. at ¶ 22.

## II

### A

Defendants rest their arguments solely on Rules 403 and 404 of the Federal Rules of Evidence. These rules set forth circumstances in which evidence of unquestioned relevance must nevertheless be excluded.

Rule 403 applies to evidence the probative value of which is substantially outweighed by a danger of unfair prejudice. The qualifier—*unfair*—is all-important. The rule is not triggered

merely because evidence is prejudicial to a defendant's case. The Government's evidence should be. Only *unfair* prejudice is prohibited. Relevant evidence becomes unfairly prejudicial and excludable under Rule 403 "when there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence." *United States v. Hassan*, 742 F.3d 104, 132 (4th Cir. 2014) (quoting *United States v. Siegel*, 536 F.3d 306, 319 (4th Cir. 2018)).

Rule 404(b)(1) prohibits the admission of evidence of a defendant's other crimes or bad acts to show that the defendant acted in conformity with a character trait reflected by those acts. *United States v. Sutherland*, 921 F.3d 421, 429 (4th Cir. 2019). "Critically, however, not all prior 'bad act' evidence is encompassed by Rule 404(b). Instead, the rule is only applicable when the challenged evidence is extrinsic, that is, separate from or unrelated to the charged offense." *United States v. Brizuela*, 962 F.3d 784, 793 (4th Cir. 2020) (cleaned up). Conduct is intrinsic, and therefore does not implicate the rule, when it "arose out of the same . . . series of transactions as the charged offense, . . . or is necessary to complete the story of the crime on trial." *Id*. at 794 (alterations original) (internal quotation marks omitted).

### B

At the outset, the Court will dismiss as moot Defendants' objections to those calls the Government does not intend to introduce. *See* Dkt. 147 at 6–7. Those aside, the five following conversations remain contested.

**November 21, 2017 call with Mona Snow**

Defendants seek to exclude the bolded portions of the following conversation.

> Bryant Snow: And look, the dope around Greene County, you'd have to go, you know it'd be shitty dope around Green County.

4

Well, you know, you'd have to drive an hour and a half to Richmond, an hour and a half back. Three hours to Baltimore, three hours back. Roanoke, you know something, maybe if you get lucky you get something decent up in Charlottesville. Well now the good dope is fucking here. I mean you can take a walk from the house to get shit that will kill you, I mean just drop you dead. Fuck it you know, just stone cold dead. Before you get the needle in your arm, you're dead. **And I mean, to put it in this perspective, when I was getting dope just recently, if I was going to sell it I'd take .3 grams and put .7 of straight fake shit on top of it, and people would hit it and say "god damn that shit's good". You know, I would triple it, you know what I mean? I would more than triple it. I would take .3 and make it 1. Every time. But I was just using .3 for myself, do you know what I mean? So I was just thinking there ain't no sense in cutting my own shit, so I was shooting the strong shit. And you know I'd see where Rachel was, I would give her .1, and you know she was shooting pure shit, just like I was shooting pure shit.**

Mona Snow: Unintelligible

Bryant Snow: What? Because she already knew what was up. I mean I was the man though.

Mona Snow: What?

Bryant Snow: I was the man. But, I mean, it just, it was never enough. Especially when, I mean me and her was doin 300-400 dollars' worth of pure a day.

Mona Snow: Why aren't [unintelligible]?

Bryant Snow: By cutting and selling the rest of it. But you can never catch up enough. You can't do drugs and sell them too. You got to either leave it alone—not when it comes to something addictive. You got to either leave it alone and sell or use because your run only last for so long.

Mona Snow: Mmhm.

**Bryant Snow: Yeah, it wasn't nothing for me to make a thousand dollars a day when I first got out. I was making, I was on average, if—I was pissed off if I got—If I was making 900 and some. I was mad.**

Mona Snow: Jeez

5

**Bryant Snow:** When I first went up to the house I was *mad*.

**Mona Snow:** And here I am struggling and trying to give you money too.

**Bryant Snow:** Well I was turning a lot of it in, I kinda got fucked. No, I wasn't bothering you right at the beginning. It was after I kind of got fucked. It didn't work so good.

**Mona Snow:** Well—

**Bryant Snow:** Yeah I was pissed. One day I was making—

**Mona Snow:** You had the nerve to get me to drive you to get groceries and everything and you're making 900 bucks a day?

**Bryant Snow:** But I wasn't after a while mom. It only went for a little while.

**Mona Snow:** Well…

**Bryant Snow:** You know?

**Mona Snow:** Yeah.

**Bryant Snow:** And then someone got killed and it just fucked everything up.

**Mona Snow:** Who?

**Bryant Snow:** Some boy from New York got killed.

**Mona Snow:** Oh.

**Bryant Snow:** Meeting the middleman.

**Mona Snow:** oh jeez….God.

**Bryant Snow:** um…

**Mona Snow:** How much of this is Mikey into?

**Bryant Snow:** Um he is not into the same game really. But me and him together cover everything. Not much. Like he's different. I don't know I can't really explain right now.

6

>**Mona Snow: What is he doing?**
>
>**Bryant Snow: I can't really explain it right now. You feel me? I'm already locked up.**
>
>**Mona Snow: Alright. Alright.**
>
>**Bryant Snow: I wasn't selling drugs recently, this is several years ago when I was out, you know what I'm saying? Like 5 years ago when I was out. I don't know what Mikey is doing now. I just know that, that's how it is. I was getting, you know, I mean—**

A transcript of this call can be found at Dkt. 133, Ex. 1.

The Government contends that Bryant is talking about the conduct underlying Count One. While Bryant argues that the conversation is about much older conduct, making it other-acts evidence subject to the limitations of Rule 404(b).

Bryant contextualizes the first part of the conversation by referring to the time "when I was getting dope *just recently*"; and goes on to compare the difficulty of getting drugs in the past to "*now* [when] the good dope is fucking here." Since this conversation takes place in November of 2017, a rational jury could find that Bryant is talking about the series of transactions including his sale of heroin in October of 2017. And since the Government is offering it for that purpose and not as other-acts evidence, the proscription contained in Rule 404(b) is not at issue. "Acts that are part of, or intrinsic to, the alleged crime do not fall under Rule 404(b)'s limitations on admissible evidence." *Brizuela*, 962 F.3d at 793 (cleaned up).

The second part of the conversation, in which Bryant discusses the difficulties of making money as a drug dealer, also appears to refer to the period in which the conduct underlying Count One would have occurred. Bryant is talking about the time when he "just got out." According to a campaign leaflet distributed by Larry Snow, Bryant was sentenced to one year

7

and four months' imprisonment on an unlawful wounding conviction in 2016. Dkt. 147 at 2. And while Bryant ends the conversation with his mother by insisting that he is talking about events that occurred five years ago, a rational jury could question Bryant's veracity on that point. Bryant has no other jail sentences that the Court is aware of. And Bryant's mother has just asked about a co-conspirator who had not been arrested. Bryant's comment appears calculated to foreclose that topic and protect his friend from authorities who might be listening in.

**April 21, 2018 call with Larry Snow**

Bryant was sentenced on April 20, 2018 on state charges. In this jail call, Bryant discusses his sentence with his father.

> Larry Snow: well Bryant, I believe what smoked you was your probation report
>
> Bryant Snow: oh yea
>
> Larry Snow: because that was damming at best, you know, and it was bad… it was bad.
>
> Bryant Snow: [unintelligible] you know, um, Scott Burns had the same woman too and I mean he'd been dirty a dozen times and um, he just kind of used his dad's death you know
>
> Larry Snow: yeah, yeah
>
> Bryant Snow: she didn't remember, she liked, they liked each other but Dan is a sweet guy but as soon as she left and he got a new one, she violated him.
>
> Larry Snow: well, somebody set him up too, yeah, um, I was either Jaime Sullivan set him up, or [Person C] and somebody else set him up.
>
> Bryant Snow: Who, Scott?
>
> Larry Snow: yeah
>
> **Bryant Snow: yeah [Person C] and um, uh, [Person C] introduced him to the guy**

>**Larry Snow:** well ok, that little cock sucker
>
>**Bryant Snow:** there's another guy in here that, his name is Chris Mahon, and um he, uh, he realized that [Person C] was setting people up and got away from it quick, uh…
>
>**Larry Snow:** well I'm surprised that somebody ain't smoked [Person C]'s ass no bigger than he is.
>
>**Bryant Snow:** oh someone's gonna… I mean, uh, I could have when I was out last time with the girl…
>
>**Larry Snow:** yeah I know, yeah
>
>**Bryant Snow:** the girl I was with begged me not to. I was at her house and didn't even know I was there I was standing right around the corner. He showed up at the door, I was going to pull him inside but you know he's in Florida now [Unintelligible] but he'll be back up here
>
>Larry Snow: oh sure, yeah
>
>Bryant Snow: but so will [Person A] and everybody you know?
>
>Larry Snow: well oh yeah, [Person A] is going to get his I promise you that. I was talking to…I was talking to um, uh, [Person B's father] earlier yesterday and uh, his boy, uh [Person B]…do you know him?
>
>Bryant Snow: yeah, he's sitting right in front of me
>
>Larry Snow: oh ok, yea, see they…they kind of set him up too according to [Person B's father] they wanted him to go to Richmond and and and turn somebody. He wouldn't do it so they got, uh, Red on the Head to do that and then, uh, that's how he got hooked up and got his five years' probation and everything

A transcript of this call can be found at Dkt. 133, Ex. 3.

      Defendants argue that the bolded excerpts should be excluded because they are about Person C, and they are not charged with intimidation or harassment of Person C. But the statements are placed within a larger conversation about cooperators in which the Defendants

9

exhibit a desire to see harm come to those who cooperate with law enforcement; and in which Larry Snow promises that Person A will "get his." The conversation is relevant to show motive and, though prejudicial, is only fairly so.

**April 30, 2018 call with Mona Snow**

>Bryant seeks to exclude the bolded portion of the following call on Rule 403 grounds.

>>Bryant Snow: I just got a letter. I just got um, uh, I just got mail from dad, and it's got the um, um, I'm trying to read what dad said…oh okay. Oh all those books are are- are soft- soft back? Paperback?
>>
>>Mona Snow: Well, yeah.
>>
>>Bryant Snow: Um well yeah I got a lot of mail from dad in it…It um, you know the-they said that the person that got me was confidential informant you know so all they gave me was his name, I mean was his CI number, but it has his, it has the vehicle-
>>
>>Mona Snow: The what?
>>
>>Bryant Snow: The vehicle.
>>
>>Mona Snow: Oh.
>>
>>Bryant Snow: -and the license plates on the paperwork so I got dad to pull the DMV records, and I got the person's name so I'm going to highlight everything send it to Rachel so she can put it on my Facebook and her Facebook-
>>
>>Mona Snow: Mmhm.
>>
>>Bryant Snow: -and so on and so forth.
>>
>>Mona Snow: That's pretty shitty.
>>
>>Bryant Snow: Yeah it is, so-
>>
>>Mona Snow: Especially since he sells and uses and everything.
>>
>>Bryant Snow: Yeah, that's who I was- that's who gave me the heroine. You know, it's crazy.

10

>Mona Snow: Yeah, it is. And he's a real nasty dude. Why didn't they um- Why didn't they use you as an informant to get him?
>
>**Bryant Snow: Because I won't work for those faggot pieces of shit. (unintelligible)**
>
>Mona Snow: Ah that's true. That's true, you won't squeal on anybody or help em.

A transcript of this call can be found at Dkt. 133, Ex. 5.

This call is probative because it reveals Bryant's disdain for law enforcement and those who work with law enforcement. Animus towards such individuals tends to make it more likely that one would want to retaliate against them. And as with the previous conversation, it is only fairly prejudicial.

**May 2, 2018 call with Rachel**[1]

Defendants move to exclude Bryant's statement, "When I was selling drugs, I knew that was illegal." A transcript of the call can be found at Dkt. 133, Ex. 8.

Defendants argue that this statement poses a Rule 403 problem because it is just as likely to refer to Bryant's sale of methamphetamine in November 2017, a crime for which he has already pled guilty in state court, as it is to the sale of heroin alleged in Count One, which occurred in October 2017. The Government argues that Bryant can offer that explanation to the jury, and thus this is a question of weight and not admissibility.

---

[1] Defendants also object to discussions of their state charges contained in calls from this date on grounds that such discussions could confuse the jury as to the charges before them. The Court intends to provide a limiting instruction and explanation of the procedural timeline and the prior state charges to mitigate against any confusion.

11

The statement is admissible for the same reason the November 21, 2017 statements are admissible. The Court also notes that Bryant refers to "selling drugs," which suggests more than a single transaction.

**November 9, 2019 call with Mona Snow**

After being charged federally, Bryant talks with his mother about how someone is on his "list of six snitches." He states, "they're setting people up the way [Person A] set me up," and later says he is "proud of what I've done . . . you'll never see my name on no paperwork." Bryant goes on to use a racial slur to describe the commentator's family, and states that he hopes some "dumb ass ODs and dies."

Bryant argues that the statements generally pose a Rule 403 problem, and that his discussion of the commentator's sister may be used, in violation of Rule 404, as propensity evidence—i.e., that he is the sort of person who retaliates against confidential informants and so is more likely to have sought to retaliate against Person A. The Government argues that this call is directly relevant to Bryant's state of mind on Count Two because Bryant is discussing his disdain for those who work with law enforcement.

While Bryant's vitriolic feelings in November of 2019 is fairly probative of his state of mind in April of 2018, its value is cumulative. The Government has other evidence directly bearing on Bryant's state of mind toward Person A. Moreover, what little is added by this evidence is substantially outweighed by the danger of unfair prejudice arising from Bryant's sadistic pining and use of racial epithets, as well as the possibility that the jury will use the evidence for an impermissible propensity purpose. Defendants' motion will be granted with respect to this call.

## III

In conclusion, Defendants' motions, Dkts. 133, 139, are **DENIED** with respect to the call from November 21, 2017, with Mona; the call from April 21, 2018, with Larry; the call from April 30, 2018, with Mona; and the call from May 2, 2018, with Rachel. Defendants' motions are **GRANTED** with respect to the call from November 9, 2019, with Mona. And the motion is **DISMISSED** as moot with respect to all other calls in light of the Government's representations.

Entered this 26th day of January 2022.

_____
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE